Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and its honorable court. Good morning and welcome to the second day of this sitting by teleconference. We were supposed to be in Atlanta, Georgia, but obviously things have changed a little bit and we're doing this by participating. Valerie, our courtroom deputy, will give you a two-minute warning during your argument so you'll have an idea when your time is drawing to a close. Other than that, we'll try not to talk over each other as best we can and get through this. Yesterday's session worked out pretty well, so hopefully today's will too. And with that, we'll begin with our first hearing, which is on page 19-10014. Aaron Tonkyro v. Secretary, Department of Veterans Affairs. Mr. Magri, we'll start with you. Thank you, Your Honor. This is Joseph David Magri. I represent the appellants. There are two overarching reasons to reverse the district court. The first is set forth in Issue 6. Since that brief was written, the Supreme Court has issued its decision in Babby-Bilkey. And the result of that decision was a consideration of the free from any discrimination language, which appears in both the ADA, which that case was about, and Title VII. And the Supreme Court, to make it short, the Supreme Court applied the Mount Healthy analytical framework, not the McDonnell-Douglas framework. It expressly rejected Gross and Nassar. And in Gross, by the way, the court was asked to apply Mount Healthy and rejected it because of the language of the private sector statute. So we believe that decision changes the analytical framework and requires reversal in this case. The second overarching concern is that there is direct evidence from whatever could be called the decision maker for every material adverse action in this case. Those statements come under federal rule of evidence 801D2 from two hospital directors and the chief of staff and the service chief of radiology relating to the derailing of careers by preventing the ultrasound technologist from obtaining three separate supervisor positions that became open and two lead technologist positions in the PCA, which became open. The direct evidence in that case... Mr. Moghery, one of the things that the district court noted in its order was that for at least one of those positions, I think the one involving the mammography position, it was filled another way. They decided to allocate resources differently. What do you say about that position if they decided not just to not fill a position like happened with the other two, but with that one, that they just allocated resources differently and decided to put the money for another position in another department? That was not a decision that was made at the time the PCA leads were open. That was a decision that was actually implemented in 2017, whereas the PCA lead positions opened in 2014 and 2015, two different ones. John Bennett, who was the AO, testified that there was no reason that the 2014 and 2015 positions couldn't have been filled during the course of litigation. This other reason came up. I believe it cannot justify the prior refusal, failures to fill. With regard to the people who made statements, we've laid that out. We've actually quoted them in our reply. We have the chief of the service making statements in which he's referring, which he's not only talking, but he's referring to what he's been told by the then director and the chief of staff. We also have, when a third position came up in 2016, supervisory position, we have Director Battle making a statement which clearly was based on the ongoing EEO case. The decision was not to simply not resolve or decide an AIB investigation, which both the district court and the secretary agree was an adverse personnel action. By not resolving it, he prevented Nikki Davis from getting the position and she was the only qualified applicant. Now, with regard to the public disclosure of EEO and Privacy Act protected and settlement protected documents, that was directed by one of the prime harassers in the prior case, John Bennett, the AO. It was covered up by Bennett and Stenzler. Bennett ordered the in our brief, and I won't go through it again, the factors all surrounding that. What did those records consist of, the ones that were publicly disclosed? They consisted of a variety of different things, but they included EEO records, or at least some. We believe from the testimony of one of the HR people that there were others that were there at one point, but not later. They also included many Privacy Act protected documents, and they included documents which the agency had agreed to remove from the files of the plaintiffs where they were improperly accused of doing certain things that they had not done. Those documents were actually disclosed. That was by order of Bennett. The management instituted AIB. That was done by Stenzler and Cotolo. Cotolo is the chief of staff. Both of them were implicated in Stenzler's direct statements. This is Judge Anderson with a question in regard to this AID investigation and Plaintiff Davis. She's the one that is at issue in that position. You're right, Your Honor. Is there any evidence that Geraci, the employee who made the complaint against Davis, which in effect killed her chances, is there any evidence that she was part of the conspiracy? My indication from the briefs is that her complaint against Davis was completely voluntary. Well, I think if you look at the timing and the circumstances... I'm talking about evidence that she was part of the conspiracy against these plaintiff nurses. Well, I believe if you look at all the evidence, a jury could find that, but the key here is less that and more that Cotolo and Stenzler wanted the AIB to look into this. That is what killed Davis because as long as they were looking into it, they had decided she couldn't get the job. No one would decide this because deciding it would have did not recommend discipline or anything else other than training and team building. But it did find that she was guilty of bullying Geraci. They found that based on the fact that she was addressing quality issues with Geraci and that that wasn't part of her duties. But in fact, it was part of her position description duties that she was the person, the primary person, because they didn't have an ultrasound trained supervisor. Davis was the primary person that dealt with quality issues within there. The AIB didn't know that because they're not familiar with ultrasound and they weren't clinical people. But that's what the record shows. This is Judge Anderson still talking. If I may, I would shift you to the January 2014 ultrasound supervisor position. It appears to me that you have not preserved that issue for appeal. You mentioned it in the brief in response to summary judgment in the district court. You mentioned Dr. Stensler's comments to plaintiff Conquero that the director and the chief of staff did not want any of these plaintiffs in that position, which would be pretty strong evidence but then in the argument section in the brief to the district court, you do not argue that. You argue for plaintiff Conquero only about the lead ultrasound position in PCA. It seems to me you have not preserved the January 2014 ultrasound supervisor position. How do you respond? I argued about that extensively in the factual posting. But you did not in the argument section. Is that not correct? I believe that I argued about all those things in the argument section. Also, I believe that I argued about them in the reply brief as well. I have a thing in there about derailing careers. I mentioned all three positions. In fact, I criticized the district court and the peer. The court also did not address the 2015 position that came through VACA, which we raised. I have one more problem about preservation of error. With respect to the matter you bring up in your 28J about the Monoghan case and the standard, the Burlington standard instead of the Kowalski standard, I looked closely at your brief to the district court again and it seems to me that you make only a substantive hostile environment argument in your brief to the district court, not a retaliatory hostile work environment claim. How do you respond to that? I believe I made both claims. Those were the hostile work environment claims. I think that it would be fair to say we did not raise the Monoghan issue in the lower court, but I believe we made the hostile work environment claims under the theories alleged. Most of the plaintiffs were retaliatory hostile work environment. One plaintiff had a substantive sex-based hostile work environment as well, and that would be Hernandez. But Hernandez also had a retaliatory hostile work environment, and those were all made, and the court down below didn't address those. It didn't find that we did not make them. All right, Mr. Moghery, thank you very much. You've saved your time for rebuttal. Thank you. Ms. Wah-Korinis? Ms. Wah-Korinis, whenever you're ready. Thank you, Your Honor, and may it please the court, Jennifer Korinis for the secretary. The plaintiff's case here really is built largely on gossip at the VA regarding their 2013 sexual harassment lawsuit, but they failed to tie any of these remarks to decision-makers or to alleged adverse employment actions. I want to take up Mr. Moghery's second reason. This is not a direct evidence case. Under this court's precedent, only the most blatant remarks made by a decision-maker constitute direct evidence, and I would submit, Your Honor, none of the gossip rumors that were discussed here were tied to Stensler, who the plaintiffs go at great lengths to insist is a decision-maker, and that's right, and importantly, they're not connected to any of the actions that were taken here. Rather, where they claim that there is adoptive admissions by Stensler, that's on testimony of one doctor who occasionally attended lunch meetings where Stensler sometimes was there, where Dr. Parise, who no question made some inappropriate comments, was not a decision-maker, supposedly discussed their settlement, seemed displeased with them, but Dr. Easton, who was there, said, well, it was a few times. He generally discussed the settlement. I don't know whether or not Dr. Stensler was there. He was often there. That's it. The other people who are cited to who said he had stopped going to those meetings in 2011 and heard second or third hand that Dr. Parise had gotten into some trouble, he assumed it was harassment, and Dr. Bailey, who said that she had heard that these things were sometimes discussed. That's it. Ms. Kourounes, this is Judge Jordan. Could you tell me about the claim that Stensler said that the plaintiffs would never be allowed to be supervisors and what the genesis of that contention is and what you think about it? Yes, Your Honor, I'd be happy to. That's in December 2013, a couple of months after the settlement of the sexual harassment case. According to Tanki Rowe's testimony, it's really important to go to the record here. I know it's extensive, but her testimony is she was talking about applying for a supervisory position. Stensler was supportive of that. Again, he's the I bet Fogarty and Cutolo, Fogarty then the director who left in 2014, don't want me to be a supervisor. He supposedly said, I guess not. That's it. That's not in connection with any decisions that were made. That's not Stensler saying, I'm never going to let any of you be supervisors. And it's a quantum leap to go from that to actions that happened months later and say this is all part of this grand scheme to prevent all of them from becoming supervisors. It simply doesn't support that imprint. This is Judge Anderson with a question. If the plaintiff did preserve her challenge to the January 2014 ultrasound supervisor position, that would come shortly after this alleged strong evidence from Dr. Stensler. Would it not? And Your Honor, that's right. You're right. Forgive me for that. But let me talk about that. As you said, if it is preserved and we would argue that it isn't, but if it is the January 2014 position was a GS 11 level supervisory position. The plaintiff alleged that it was structured specifically to prevent them from obtaining it by requiring a DRT, which is a diagnostic radiology technician, I believe is the acronym, to supervise ultrasound and MRI. And the claim is that was an additional requirement that was added as a scheme to prevent them from getting it because they were medical instrument technologists at MIT. And they point to the handbook saying that it doesn't require it. And first of all, this is why generally courts don't get involved on this granular level of personnel decisions because they're not a personnel department. But if you look at the handbook pages that are cited, it discusses medical instrument technologists, MITs, and someone can be an MIT only if they're supervising exclusively ultrasound. And in Tanquira's deposition, she says when asked if a medical instrument technologist could supervise both the ultrasound and MRI, she said, I don't see why not. That's really all the evidence that there is, which is not strong evidence, even that that was not required to be a DRT to supervise both of those modalities. That's all that there is. And so that's the evidence from which they want this court to reverse and say a jury could find based on that in their favor. And I would submit, Your Honor, that is pure speculation. The jury can only draw reasonable inferences from evidence. That is not evidence. That's speculation. This is Judge Jordan again. Yes. Tell me about the plaintiff's claims that relevant decision makers and others at the VA were intentionally disclosing information having to do with the EEOC proceedings and that that constituted retaliation. Sure. The plaintiff's site in their brief and with the record shows, the testimony shows, again, that there's no question that the radiology department was ripe with gossip. And part of that gossip was about their settlement. And they amount very wildly. This is not Stensler saying, hey, everyone, they settled these claims for whatever the amount, I believe, $170,000 or something like that. These are people saying, I heard it was $50,000. I heard it was a million. That's what they're talking about. And so this is just rumors among doctors who don't have firsthand information. No one says, Stensler told me that they settled these cases for this amount. Stensler told me they're troublemakers. He's mad at them, anything like that. And Director Battle, they claimed that he knew all of these terrible things were happening. He said, I knew they had had a case and they won the case. You can look at his testimony. Stensler said, I knew there was some gossip. There were no disclosures aside from what you refer to as gossip about the settlement amounts? Your Honor, as far as I can tell, there were not, not based on the record. And as far as the privacy information. There were no disclosures about what the claims were? Oh, I'm sure that there were discussions about what the claims were. But again, I don't see anything in the record where we have a decision maker like Stensler or the Director Battle disclosing specifically what the claims were. People knew what they were. A lot of the had testified as witnesses. They didn't need Stensler to tell them what the claims were. But the point is, there's simply no direct line from a decision maker to a statement made to someone there saying, here's this private information about these settlements that you don't know. And I'm going to tell you about them. I just, if there's something in the record, again, it's an extensive record. I have not seen it, Your Honor. The problem, this is Judge Anderson, the problem for me with respect to this publication of confidential information is that it seemed to me in the brief, the only real excuse of the hospital was mistake. And there was just clearly conflicting evidence about who did it, who ordered it. And that clearly is a jury question whether or not it was a mistake. So it seems to me it might be a jury question unless you have some other reason. Your Honor, I would say it's not a jury question. And I agree that there's some conflicting evidence once it was discovered what happened, who looked at it. From the outset, it seems from the testimony, as the memory serves these folks, that Mr. Bennett said, when the supervisor was leaving, he told her to put all of her supervisory files on the S drive, probably a bad idea, not a discriminatory idea, all of the supervisory files on the S drive, so that the new supervisor could download them. He didn't do that. Whether Bennett forgot to tell him, it's not clear. Bennett says that he didn't tell Eubanks that. And Eubanks said he did. And you give no other reason why that publication was made except mistake. Why is it not? I guess your only reason is that it's not attributable to a decision maker. But Bennett is clearly in line in the chain of command. Is he not? He's not, Your Honor. And he was deliberately taken out of the chain of command after the 2013 sexual harassment settlement. It has to be a material fact. The documents were there, all of the employee's documents were there. And if there's any conflicting evidence, it's not a material fact. And if you look at the cases in which something like this, public disclosure, is found to be actionable, those are cases where, for example, and the name escapes me, I can find it, where the head of a union takes an EEO complaint from one employee, posts it on the public drive, someone downloads it, posts it on the bulletin board, and he sends a memo to all of the union members and says, this person filed an EEO. We think it's frivolous, but it's going to cost the union a lot of money. We might have to raise your dues. Very different than some sloppy, hey, we need to transfer these files. All of the employees, nobody's targeted. There's no evidence that this is widely spread. There's no evidence at all that this was done to retaliate against them. This is just sloppy record keeping for all employees. The settlement agreements were not on there. There's no evidence that people found this new information and started spreading it based on what was on the computer. And once it was found, it was immediately taken off. They looked into how it had happened and they moved on. But again, it was all of the employees that wasn't targeted of the plaintiff in this case. And so I would say to the extent that there are conflicting facts, conflicting testimony, it's simply not material. Let me ask you, go ahead, Judge Jordan, you were saying something. No, I think it was just Joe Flack. Go ahead. I'm curious about some things that are not in the brief, but they're in the background. First of all, was Dr. Parisi's involvement or in connection with the plaintiffs changed after the settlement? Yes, Your Honor, he was not in there. I'll put it more specifically. Were his duties with respect to them changed in any way? My understanding is that he was removed from any direct contact with the plaintiffs in ultrasound. He had no direct contact with them. It had nothing to do with ultrasound. Correct. With the ultrasound technologist. Yes, that's correct. And there's no fact to show about that? Not that I was able to find in the record, Your Honor. The decision maker here was and the plaintiffs say that repeatedly in their brief. Another question. If what he had done that led to the earlier settlement, if he had been an employee of Mayo Clinic or Cleveland Clinic, I dare say he would have been moved or fired, probably. Do you agree with that? He very well may have been, Your Honor. I'd have to look back into all the facts. The reason I say that, what kind of job security does a VA doctor have in terms of being terminated? Well, Your Honor, just like... What kind of process would the administration have to undergo in order to get him out of the picture, as it were? Your Honor, my understanding is that the VA has progressive discipline, like with any other employee, where it begins with a warning... Does he have a statutory provision of any kind? Your Honor, I'm sure that there is. I don't have it at my fingertips. I think VA doctors have a lot of job protection, and I know that there's a lot of administrative proceedings that would go into removing someone. I had a case... Yes, Your Honor. The reason I mention that is that if you have somebody who can hardly be terminated, and they're basically in the same position they were in beforehand, it sends a message. First of all, he was free at those luncheons to rant and rave all he wanted to, because he's protected. I understand what you're saying, Your Honor. And he was, in theory, free to rant and rave. The only doctor who is there who testified about them, say he mentioned it a few times. There's even a citation in the brief that supposedly he talks about, well, gosh, at Bay Pines, when they settle, they have to leave. And he was complaining, supposedly, that that was the case here. And nothing of the kind. The anonymous memorandum that was written by the two doctors reflects what I'm concerned about. They, in effect, said to battle, to everybody, nothing has changed since the settlement. In other words, I'm just kind of summing it up that way. Yes, Your Honor. That's the flavor of it. I agree. Okay. So given that you keep somebody in the same basic position, I don't care if it didn't have immediate supervisory, he wasn't an immediate supervisor anyway, even beforehand. But when you keep them in the same position, it sends a message to the employees, I think. I think there's an inference there. And I put that together with the doctors who wrote the anonymous. It became not anonymous. Everybody knew about it. And the district court dealt very lightly with that in terms of whether under those circumstances as a whole, under an objective test, under an objective test, whether or not there was a connection to retaliation. Your Honor, I think there's a good reason that the court dealt with that fairly lightly, as you say. And if you look at it again, you can make broad sweeping statements, but there still has to be a connection to retaliation in that environment. No, but I'm saying it's strong. And I speak for myself is very strong circumstantial evidence in that case. Well, if we look at the letter and we look at the testimony of the doctors who wrote it, that's Dr. Bailey, Dr. Andrews, and I believe there was a third Dr. Easton, if I'm not mistaken, I might be wrong on that. But I know for sure it was Dr. Bailey and Dr. Andrews. And you look at their testimony and Dr. Bailey said, well, gosh, I would think that they would be deterred. She didn't know for sure anything about whether or not what happened with them after the settlement, the ultrasound technician. She said, I'm mostly talking about Dr. Andrews, who was treated badly given disfavorable assignments and the like. I sandwiched into what I've just said. I put in what Judge Anderson just questioned you about. I'm not the least bit impressed about the mistake. I think that's a jury issue. I think it was reprehensible to put that stuff on who could access it online. Tell me who, what part of the world? Anyone who were, as my understanding, is anybody who works either anyone in radiology? I don't know. How about a future employer? No, your honor, that was on an internal VA computer drive. It was an intranet. Who could access it? People who work, my understanding, people who worked in I beg your pardon? They're the only ones that access it. Your honor, I'm not confident whether other people at the VA, but it would only be internal to the VA. It's an internal VA drive. Don't you think it's important who could access it? I do, your honor, but I also think it's important who, in fact, accessed it. Well, but the court didn't tell us who, does it? Where in the evidence do we know who could access it? My understanding is... Let's put it this way. Where can an inference be drawn as to who could access it? I think from the plaintiff, if you look at the plaintiff's brief, I believe they were talking about people in radiology. I think it's reasonable to say people in radiology, but really... Is your answer that you don't know? My answer is I don't know, your honor. Okay. Judge Anderson has... Let me put it this way. Can we find it in the law, in the VA regulations? In the VA regulations, whether others could... Yeah. The whole regulatory body having to do with the posting of these things. I don't think so, your honor. I think, again, it's internal to the radiology group. It's a computer. There's an S drive that others in the group can, in theory, access. Not clear that they did. And again, it's information. I'm not saying it's good, it's not, but it's all of the employees in radiology's private information. It's not clear that people, in fact, accessed it. It was put on a drive that people in radiology could access, but I'm not aware of any regulation. This is... You're telling me that the only people who can access the posting are in this specific radiology department? That was the question to which I said, I don't know, your honor. That was my understanding, but I'm not confident saying definitively that that is the case. Maybe you can give us that information in a supplemental briefing. I'd be happy to, your honor. Judge Anderson has one more question. Yes. If the plaintiff did preserve a retaliatory hostile work environment claim, as opposed to substantive hostile work environment claim, if that claim was preserved for appeal, is it not clear that we have to remand that issue to the district court because he analyzed it under the severe and pervasive standard instead of the Burlington standard? No, your honor, it's not at all clear. And again, as I stated in the supplemental authority letter with Monaghan, it's really important to remember that under the Supreme Court's case in Northern Railroad, a retaliation claim, just like a discrimination claim, is completely separate from a hostile work environment claim for the purpose of benefiting a plaintiff. Because the purpose of whether it's discrimination or discriminatory hostile work environment, retaliation or retaliatory hostile work environment, the point is those are two standards. So it's either a discrete action that's retaliatory, that has to be material adverse, but it would dissuade a reasonable employee, and that's Burlington Northern. Or if you can't get there with this discrete actions, you can look at a series of actions. And that's to benefit the plaintiff to give them another way to satisfy the adverse employment action. And that is why Gowski correctly followed other circuits and applied the hostile work environment standard and Harris to say, well, if we can't get there with a discrete action under a retaliation claim, we can do the alternative thing with a retaliation. But this this panel is now bound by Monaghan. Your honor, I would again submit that this panel is is bound by Gowski because Monaghan looked at this, but it was a retaliation claim. It wasn't a retaliatory hostile work environment claim in Monaghan. Gowski is what? Counsel, your time has expired. Yes, your honor. Thank you. You can finish answering the question, Ms. Karina. Sure. So I want to go into, if I may, a little bit Monaghan. And I think that the issue in Monaghan, as I understand it, is looking, first of all, the district court did a real disservice by analyzing a retaliation claim, a discrete retaliation claim by a hostile work environment standard. That's wrong. But that doesn't mean the hostile work environment standard is wrong. And I understand if you look at the retaliatory hostile work environment standard articulated in Gowski, it says it repeats what is in other hostile work environment causes of action that Meritorious Harris, the familiar severe or pervasive sufficient to alter the terms and conditions of employment. That last part is what Burlington Northern rejected. And I understand that. But that doesn't mean we throw out a hostile work environment claim, because if we make the standard for a hostile work environment claim, the same as retaliation, you remove that ability of a plaintiff to use this group of things. And you're actually raising the stakes for them. So I think a way to harmonize this is to say... But why in the world would a plaintiff want to try, you say it's an alternative way, but why would a plaintiff try to establish an alternative way that is much harder for him or her to satisfy? If you apply, as you put it, the Gowski standard, which you think was correct, why would any plaintiff ever try to do that, as opposed to trying to show that a retaliatory hostile work environment would have dissuaded any reasonable employee from complaining about something? Your Honor, again, I think there's a way to harmonize these, okay? If you say that because the hostile work environment claim is still important because you're either looking at a discrete action, and if you can't rise to the level of two discrete actions, you can take a long group of things and say, well, that's a hostile work environment. But if you just make it material adverse such that it would dissuade a reasonable employee, as opposed to subjectively and objectively hostile, abusive, you're removing a benefit that the Supreme Court tried to give in Harris. And so, again, if I could just... I think a way to harmonize this and to take out the terms and conditions of employment language, again, for a retaliation claim Burlington Northern got rid of, is to say you can either show a discrete action that's retaliatory, Burlington Northern, or you can do this alternative thing with things that don't meet a retaliation standard because they're kind of lower level. They don't meet the material adversity standard, but if you group them together, they are sufficiently severe or pervasive to dissuade a reasonable employee from bringing a claim. They're material adverse in a group. So you don't have to throw out Gowsey. All right, Ms. Cruz. Thank you very much. We've taken you way beyond your time, but thank you very much. That's quite all right. Thank you, Your Honor. Mr. Magri, you can have your rebuttal time. Yes, this is Joe Magri. First of all, I would encourage the court to actually look at the... Mr. Magri, I think Judge Choflat is trying to ask you a question. Oh, I'm sorry. Can you answer any of the questions that I've put to your colleague? Yes. First of all, about the doctor's, Parisi's, protection that he would not have if he were working for Mayo Clinic or Cleveland Clinic or any private hospital. Are you familiar with his protection? Oh. How hard it would be to terminate his employment? The answer to that depends on whether or not you are one of the people that are protected within the VA. In his case, he was not punished. And we put this in both the response to summary judgment and we mentioned that. Well, the question I have is, I think maybe he couldn't be without some kind of a hearing, a trial, as opposed to management deciding as a matter of good business judgment. I'll ask another question. Did anybody higher up, battle on down who are above him ever, is there any evidence that they ever told him to keep his tongue quiet? No, there isn't. The one person who claimed that he started to say something was Stensler 30 days before the September 2017 depo where I asked him about what he did with Parisi. At that point, he said, I told people to stop rumors about Stensler. No one else heard that. Stensler was Stensler's immediate supervisor? Stensler was his immediate supervisor. And bear in mind, these rumors began. Who was above Stensler? The chief of staff who was Petolo for a period of time. Did he deal with him? He did not. He was at the luncheon from time to time, was he not? Stensler was there as a normal participant. Petolo, Battle even knew. And so did Petolo about the fact that this was going on because people were complaining about it. And Battle, who was a director, knew because it was in the... He knew about it? Yeah. And they did nothing. In fact... Is it reasonably inferable that Battle knew about it? Oh, yeah. It is referenced in the anonymous that became non-anonymous email or memo that was sent to him in a date stamp by Battle. What I mean is... June 21 of 2016. I'm talking about the director, did he communicate... Stensler's boss, did he communicate with Battle? Stensler's... I mean, Petolo... Petolo, I mean, Petolo. Petolo was directly under Battle. None of them did anything. What evidence is there that he and Battle talked about it? That Petolo and Battle talked about Parisi? Yeah, about the atmosphere that was coming out of those luncheons. Well, Battle was focusing on Parisi. Battle admitted that he knew. He had heard about these rumors going around when I asked him about that during depo. Everybody knew this stuff. If you look at Dr. Aaron Andrews' testimony, it's amazing how far all of this stuff spread, but not really amazing because of who was the original sources of it. And then I'll be quiet. The reason that I'm concerned or interested in the legal... the security that Parisi had is that if you have a regiment in which abusers are protected because it's almost impossible to fire them, then once a complaint is made, you send a message, don't ever make another complaint because it isn't going to bother this individual. The government may have to pay some money, but the individual not. Well, I think that occurs, but at a worse level. It is not that the system prevents taking action against Parisi. There's a zero tolerance policy for sexual harassment in the VA, according to the VA. It is not that the system prevents it. It's that management at this facility prevented it. And we detail what Petolo, who was in charge of Parisi's... what was supposed to happen to Parisi and nothing did in the early part of the brief. If the system is set up, it is almost impossible to do something about Parisi. Then Battle and those higher up are not going to undertake the awesome task of bringing some kind of procedure. That's why I want to know what the procedures are. Your Honor, Battle and those up higher, the procedures are they have to propose some action and then they have to take it. And if someone's been involved in a sexual harassment claim, they're supposed to be zero tolerance. They can get anywhere for a first offense termination, according to the VA guidelines. None of that happened here, not because the system is necessarily a problem, but because the people running the system were protecting Parisi. They were protecting Stensler. They were protecting each other. And what they did to these... I want to point out, there's two things that were mentioned. You've got about a minute left to go, Mr. Magri, so you can make that point and then wrap up. Yeah, I quoted the direct evidence and cited to it. Please look at that, not counsel's descriptions of it. If you look at page 46 and I believe it's 52, you will see that we mentioned in the argument portion of the brief, after extensively discussing all three supervisory positions, on page 46 and page 52, we discuss the three supervisory positions. Also, with regard to this issue about the hostile work environment, that ends with, it is remarkable that we would tell women who are victims of sexual harassment that they can complain about it and get paid a large amount of money, but they have to forego their careers, accept ridicule, harm to their reputations, and have their very futures made uncertain for the reason set forth above the court's decision should be reversed and remanded. That's a description of a retaliation claim. All right, Mr. Magri, thank you very much, and thank you very much, Ms. Kourinas. Thank you, Your Honor.